STATE of Wisconsin, Plaintiff-Respondent,

v.

Peter T. HEINE, Defendant-Appellant.

Court of Appeals

*No. 2013AP1022–CR. Submitted on briefs January 7, 2014.
—Decided January 22, 2014.*

2014 WI App 32

(Also reported in 844 N.W.2d 409.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Gina Frances Bosben*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, *Sandra L. Tarver*, assistant attorney general, and *Jordan D. Kohl*, volunteer attorney.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Peter T. Heine appeals the judgment convicting him of first-degree reckless homicide, as party to a crime, in connection with his sale of heroin to a person who died as a result of ingesting the heroin. *See* WIS. STAT. §§ 940.02(2)(a), 961.14(3)(k), & 939.05. His only claim on this appeal is that the trial court deprived him of his constitutional right of confrontation by receiving into evidence a toxicology report, which analyzed blood and urine the physician performing the autopsy recovered from the victim's body, without requiring the testimony of those involved in analyzing the specimens. Significantly, the report, although it was received into evidence, *was neither introduced nor received into evidence to trace or identify the specific heroin* the State said that Heine sold to the victim. As we show below, we need not analyze who among the many persons who participated in the toxicology analyses had to testify in order to satisfy Heine's right to confrontation because the physician who performed the autopsy testified at the trial and

3

could, consistent with Heine's right of confrontation, rely on the report in giving his medical opinion that the victim died from a heroin overdose.

## I.

¶ 2. Heine's main brief on this appeal does not challenge that there was sufficient evidence that he sold heroin to the victim shortly before the victim died. ("The state did present evidence at the trial through witnesses that Mr. Heine did in fact sell heroin to [the victim] the evening he died of an overdose. The state also presented evidence that it was very unlikely that [the victim] obtained any other drugs from anyone else in that brief time.") Thus, Heine focuses on the State's burden to prove that the victim died from a heroin overdose, not that the heroin ingested by the victim was sold to him by Heine.

¶ 3. Three persons from the toxicology laboratory testified, none of whom had any hands-on testing duties. The first person testified that he was a "toxicologist" with the testing laboratory who "reviews and releases forensic cases that come to our laboratory," which he said was "certified" by various certifying organizations. He testified on cross-examination that fourteen persons, as phrased by Heine's trial lawyer, "touched these samples in this case." The witness conceded that he did not review the raw data, but only "sign[ed] off on the final report."

¶ 4. The second person from the toxicology laboratory to testify certified the analysis of the victim's urine. She explained, however, that she did "not work in the lab" and was not, as phrased by the prosecutor, "familiar with the lab processes as it relates to the calibration of" the machine used for, again as phrased by the prosecutor,

4

"the urine opiates confirmation." The third person from the laboratory to testify was the person who certified the "opioid testing" of the victim's blood. She explained her duties to the jury: "I have to review all of the data and I look at the chain of custody, make sure that it's complete as it went through the lab from each person. I verify the sequence table to make sure that there is nothing wrong with it and I review the entire batch, so I basically reanalyze it, if you want to think of it that way." She testified, though, that her review of the data was limited to checking "the chain of custody," and that their "analysts [had] run a calibration." The trial court received the toxicology report into evidence over the objection of Heine's trial lawyer, opining that the jury could give the report whatever "weight" it deemed fit.

¶ 5. Vincent Tranchida, M.D., the Chief Medical Examiner of Dane County, autopsied the victim. He told the jury that he had been Dane County's Chief Medical Examiner since January 1, 2011, and had been "a Senior medical examiner in the Office of Chief Medical Examiner of New York City from 2003 until 2010." Before that, he "worked as a resident in anatomic and clinical pathology at the University of Michigan at Ann Arbor." He told the jury that he had done "[a]pproximately 2,000" autopsies before he assumed his Dane County duties, and that he had done "over 500" autopsies since then. Heine did not and does not on this appeal challenge Dr. Tranchida's qualifications to testify as an expert under WIS. STAT. RULE 907.02.[1]

---

[1] Neither party discusses which version of WIS. STAT. RULE 907.02 applies. The rule was amended by 2011 Wis. Act 2, §§ 34M & 37 to read:

(1) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

¶ 6. In the course of the autopsy, Dr. Tranchida noted that there were "four fresh punctures" in the front of the victim's elbow, as well as scarring from old punctures. He also found "white frothy foam" in the tube that had been used in an attempt to resuscitate the victim, that "the white frothy foam [went] all the way down deep into his airways, his trachea and his bronchi," and that the victim's lungs were "full of fluid." Dr. Tranchida also told the jury that the victim had an inordinate amount of urine in his bladder: in "my examination of [the victim]'s bladder I found that it was distended with urine. Most people tend to go to the bathroom when their urine — when the bladder starts to fill with about 200 milliliters of urine. He had 400 milliliters of urine, almost twice that amount."

¶ 7. Dr. Tranchida testified that he read the toxicology laboratory report, and that he regularly relied on toxicology results for, as phrased by the prosecutor's

experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

(2) Notwithstanding sub. (1), the testimony of an expert witness may not be admitted if the expert witness is entitled to receive any compensation contingent on the outcome of any claim or case with respect to which the testimony is being offered.

Although 2011 Wis. Act 2, § 45(5) says that the new rule "first appl[ies] to actions or special proceedings that are commenced on" February 1, 2011, the Act does not specifically indicate when the new rule first applied in criminal cases. 2011 Wis. Act 2, § 45(1), however, which deals with amendments to the criminal code made by that Act, says that those amendments "first appl[y] to acts or omissions committed on" February 1, 2011. Heine was accused of selling the heroin at issue in this case on May 5, 2011. We thus apply RULE 907.02 as it was modified by 2011 Wis. Act 2.

question, "purposes of completing [his] final diagnosis." Dr. Tranchida testified that the report indicated that a sample of the victim's blood revealed the presence of "morphine" and a "specific metabolite for heroin," as well as "codeine, which is also a contaminant often used in heroin." He also noted that the laboratory report said that the metabolite, which, he testified, "has a very short half-life," was in the victim's urine, as was "quite a lot of morphine." Dr. Tranchida opined that the substances found by the laboratory were "very consistent with a heroin intoxication." Dr. Tranchida explained that heroin kills by affecting the lungs' ability to breathe: "What it's causing is it's causing the capillaries in the lungs to dilate but causing contraction of the veins in the lungs. So as a result the fluid is pumping into the lungs but it's not coming out and being drawn back into the circulation, so the lungs get wetter and wetter with fluid." He recounted what he saw during the autopsy:

> In addition to this, the person is struggling to breathe. And the proteins that line the insides of the air sacs start to get churned up, so you start to get this froth as the person is having trouble breathing and the lungs are getting wetter and more full of fluid, and eventually you start to get this foam that starts to fill up the airways making it even harder to breathe.
>
> Now, in addition to this, we see the urine continue to accumulate. Remember this is a period of several — quite a few hours, the person is still producing urine, but because not only does heroin make you feel like you don't need to go to the bathroom, but it also causes the sphincter to be exceptionally contracted, it makes it harder to urinate, so as a result they begin to accumulate urine as well.
>
> So that's why we see foam in the airways, we see wet lungs and we see them accumulating urine in the bladder, because over this period of time they're still

7

alive, they're still processing the heroin, it's still being cleared from their system, but they sustain the dangerous anoxic brain injury and as a result they're going into progressive respiratory failure.

The prosecutor asked Dr. Tranchida for his opinion as to why the victim died:

Q. In terms of the physical examination you conducted of [the victim] combined with the toxicology results were you able to form any conclusion to a reasonable degree of medical certainty regarding [the victim]'s cause of death?

A. Yes, I was.

Q. What was your conclusion?

A. My conclusion to a reasonable degree of medical certainty for [the victim]'s death is that his cause of death is an acute heroin intoxication.

Heine's trial lawyer did not object to Dr. Tranchida's opinion and does not challenge it on this appeal.

## II.

¶ 8. As we have seen, Heine contends that the toxicology report's receipt into evidence violated his right to confront his accusers.

The Sixth Amendment to the United States Constitution provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascer-

8

tained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him;* to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

*State v. Deadwiller,* 2012 WI App 89, ¶ 7, 343 Wis. 2d 703, 707, 820 N.W.2d 149, 151 (emphasis by *Deadwiller*), *aff'd,* 2013 WI 75, 350 Wis. 2d 138, 834 N.W.2d 362.[2] We review *de novo* the trial court's decision to receive the report into evidence over the confrontation objection of Heine's trial lawyer. *See State v. Williams,* 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 109, 644 N.W.2d 919, 924.

■■

¶ 9. "The confrontation right applies to statements that are 'testimonial.' *Davis v. Washington,* 547 U.S. 813, 821 (2006); *Crawford v. Washington,* 541 U.S. 36, 68–69 (2004) ('Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.')." *Deadwiller,* 2012 WI App 89, ¶ 7, 343 Wis. 2d at 707–708, 820 N.W.2d at 151 (internal parallel citations omitted). Thus, certifications

---

[2] Article I, § 7 of the Wisconsin Constitution is similar:

In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; *to meet the witnesses face to face;* to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

(Emphasis added.) Heine does not argue on this appeal that the trial court violated his confrontation right under the Wisconsin Constitution. Accordingly, we do not discuss it. *See Reiman Assocs., Inc. v. R/A Adver., Inc.,* 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981) (issues not briefed are forfeited).

by a laboratory of tests received as substantive evidence, or the testimony by someone who did not perform the tests received as substantive evidence may violate a defendant's right to confrontation.[3] *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 311 (2009) (sworn certifications) ("In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with' the analysts at trial.") (one set of internal quotation marks omitted; emphasis by *Melendez-Diaz*); *Bullcomimg v. New Mexico*, 564 U.S. ___, ___, 131 S. Ct. 2705, 2709–2710 (2011) (certificate of laboratory analysis testified-to by a person who did not do the analysis but was familiar with the laboratory's testing procedures) ("We hold that surrogate testimony of that order does not meet the constitutional requirement. The accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.").

¶ 10. The confrontation issue was revisited in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221, 2239–2240 (2012), where the lead opinion on behalf of three other justices in support of the judgment determined that an expert could, under Rule 703 of the Federal Rules of Evidence, give an opinion based on a laboratory report even though neither the analysts nor

[3] We use the word "may" because depending on the facts of a specific case there may be factors in play that defeat a defendant's contention that receipt of evidence violated the defendant's right to confrontation.

the report's author testified, and the report could be "disclosed" to the factfinder "to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts." *See also Deadwiller*, 2013 WI 75, ¶¶ 21–27, 350 Wis. 2d at 153–159, 834 N.W.2d at 369–373; *Deadwiller*, 2012 WI App 89, ¶¶ 8–11, 343 Wis. 2d at 708–711, 820 N.W.2d at 151–153. A post-*Williams v. Illinois* analysis by the United States Court of Appeals for the Tenth Circuit is helpful:

> A prime example of where an out-of-court statement might be admitted for a purpose other than to establish its substantive truth, and one pertinent to this case, is when an expert witness testifies regarding the out-of-court development of facts or data on which the expert's opinions were based. Federal Rule of Evidence 703 authorizes an expert to testify to an opinion even if that opinion is based on otherwise inadmissible facts or data, which at times may include out-of-court testimonial statements. *See Williams*, 132 S.Ct. at 2233–35, 2239–40 (plurality op.). Although an expert often will not disclose this otherwise inadmissible information to a jury, Rule 703 permits disclosure to the jury if "the court determines that [its] probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect." Fed.R.Evid. 703. However, the disclosure of this otherwise inadmissible information is to assist the jury in evaluating the expert's opinion, not to prove the substantive truth of the otherwise inadmissible information. *See Williams*, 132 S.Ct. at 2233–35 (plurality op.)[.]

*United States v. Pablo*, 696 F.3d 1280, 1287–1288 (10th Cir. 2012) (bracketing and parentheticals by *Pablo*).

¶ 11. Rule 703 of the Federal Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

WISCONSIN STAT. RULE 907.03, as modified by 2011 Wis. Act 2, § 38, is substantially similar:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible may not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion or inference substantially outweighs their prejudicial effect.[4]

■

¶ 12. As we see, WIS. STAT. RULE 907.03 has two parts: (1) a properly qualified expert witness may rely on inadmissible material if that material is "of a type reasonably relied upon by experts in the particular field

---

[4] See footnote 1, which explains why we are applying the rule as modified by 2011 Wis. Act 2.

in forming opinions or inferences upon the subject"; and (2) the material may be revealed to the factfinder by the opinion's proponent *only* if "the court determines that their probative value in assisting the jury to evaluate the expert's opinion or inference substantially outweighs their prejudicial effect."[5] The first part of the Rule rests on the commonsense reality that a testifying expert could not be required to replicate all of the experiments and personally make all of the observations either underlying the development of the expert's field or otherwise relevant to the expert's opinion. Thus, Isaac Newton observed: "If I have seen a little further it is by standing on the shoulders of Giants."[6] Certainly, a courtroom would be overflowing if *every* giant who developed the field had to testify, and, also, few expert witnesses would be able to testify at all if they had to personally reproduce the experiments and analyses that underlay developments in their field. *See, e.g., Williams*, 2002 WI 58, ¶ 29, 253 Wis. 2d at 117, 644 N.W.2d at 928 ("Section 907.03 implicitly recognizes that an expert's opinion may be based in part on the results of scientific tests or studies that are not her own. It is rare indeed that an expert can give an opinion without relying to some extent upon information furnished by others."); *Walworth County v. Therese B.*, 2003 WI App 223, ¶ 8, 267 Wis. 2d 310, 319, 671 N.W.2d

---

[5] Under WIS. STAT. RULE 907.05, the opponent of the opinion offered by the expert witness may seek to have the witness explain the opinion's underlying assumptions and data. RULE 907.05 provides: "The expert may testify in terms of opinion or inference and give the reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

[6] http://www.phrases.org.uk/meanings/268025.html (last visited Jan. 10, 2014).

377, 382 ("It is well settled that it is 'proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others.' ") (quoted source omitted). Thus, permitting the expert to rely on inadmissible material in accordance with RULE 907.03 does not violate a defendant's right to confrontation. *Williams*, 2002 WI 58, ¶ 52, 253 Wis. 2d at 124, 644 N.W.2d at 931. *See also Williams v. Illinois*, 567 U.S. at ___, 132 S. Ct. at 2239–2240 (in connection with Rule 703 of the Federal Rules of Evidence) (the lead opinion on behalf of three other justices in support of the judgment).

¶ 13. The second part of the rule is designed to prevent the expert from being a mere conduit for inadmissible material. *See Williams*, 2002 WI 58, ¶ 19, 253 Wis. 2d at 113, 644 N.W.2d at 926 ("[O]ne expert cannot act as a mere conduit for the opinion of another."); *Walworth County*, 2003 WI App 223, ¶ 8, 267 Wis. 2d at 319, 671 N.W.2d at 382 ("[A]lthough WIS. STAT. § 907.03 allows an expert to base an opinion on hearsay, it does not transform the hearsay into admissible evidence.").

¶ 14. Rule 703 of the Federal Rules of Evidence has, as we see, the same cautionary instruction, and we have also seen that the lead opinion on behalf of three other justices in support of the judgment in *Williams v. Illinois* approved disclosing the data on which the expert relied in order to "to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2240. At least under RULE 907.03, the trial court must first determine that the "probative value in assisting the jury to evaluate the

expert's opinion or inference substantially outweighs their prejudicial effect" before the opinion's proponent may disclose the inadmissible material to the jury. As we have seen, the trial court received the toxicology reports into evidence. Assuming without deciding that receipt of the toxicology report into evidence was error under both *Bullcomimg* and *Melendez-Diaz*, and that the trial court received the report into evidence in order to explain a foundation for Dr. Tranchida's testimony, it did not make the required finding under RULE 907.03, we agree with the State that the errors, if they were errors, were harmless beyond a reasonable doubt because under RULE 907.03, Dr. Tranchida's testimony that he regularly relied on toxicology results in forming his final opinion as to cause of death laid the proper foundation for him to have relied on the toxicology report irrespective of whether that report was admissible into evidence or disclosed to the jury. *See Deadwiller*, 2013 WI 75, ¶ 41, 350 Wis. 2d at 168, 834 N.W.2d at 377 ("For an error to be harmless, the party who benefitted from error must show that 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'") (one set of internal question marks and quoted source omitted); *Williams*, 2002 WI 58, ¶ 50, 253 Wis. 2d at 124, 644 N.W.2d at 931 ("The test for harmless error is whether there is a reasonable possibility that the error contributed to the conviction. A reasonable possibility is a possibility sufficient to undermine our confidence in the conviction.") (internal citation omitted).

¶ 15. As seen from our extensive review of Dr. Tranchida's testimony, he was no mere conduit for the toxicology report; rather, he fully explained why *he*, based on his education and experience, honed in on

heroin as the cause of the victim's death: the fresh elbow punctures, the "white frothy foam" that extended "down deep into [the victim's] airways, his trachea and his bronchi," that the victim's lungs were "full of fluid," and the victim's inordinate retention of urine. It was perfectly reasonable and consistent with both WIS. STAT. RULE 907.03 and Heine's right to confront his accusers, for Dr. Tranchida to take into account the toxicology report in firming up his opinion as to why the victim died. Heine was fully able to confront Dr. Tranchida and challenge his opinion and his supporting reasons. *See* WIS. STAT. RULE 907.05 set out in footnote 5. Heine was not deprived of his right to confrontation, and the trial court's receipt of the toxicology report into evidence was harmless beyond a reasonable doubt because, as we have already noted, Dr. Tranchida could have given his opinion exactly as he gave it without referring to the report. Thus, we affirm.

*By the Court.*—Judgment affirmed.