State of Wisconsin, Plaintiff-Respondent,

v.

Jason S. VanDyke, Defendant-Appellant.

Court of Appeals

*No. 2014AP481–CR. Submitted on briefs November 4, 2014.*
*—Decided March 3, 2015.*

2015 WI App 30

(Also reported in 863 N.W.2d 626.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Matthew S. Pinix* of *Law Office of Matthew S. Pinix, LLC*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Robert G. Probst*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Hoover, P.J., Stark and Hruz, JJ.

¶ 1. HOOVER, P.J. Jason VanDyke appeals a judgment of conviction for reckless homicide by delivery of a controlled substance[1] and an order denying his postconviction motion. VanDyke argues his trial counsel rendered ineffective assistance by failing to object to evidence introduced in violation of his constitutional right to confrontation.[2] We agree with VanDyke and reverse and remand for a new trial.

## BACKGROUND

¶ 2. VanDyke was tried for allegedly delivering heroin that caused Cole Trittin's death. In the midst of trial, the parties negotiated a plea agreement. How-

---

[1] *See* Wɪs. Sᴛᴀᴛ. § 940.02(2)(a). All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

[2] VanDyke alternatively argues trial counsel was ineffective for failing to object to a lack of specificity in the Information, jury instructions, and verdict form. Because we reverse and remand on other grounds, we need not reach this issue. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (appellate courts not required to address every issue raised when one issue is dispositive).

ever, the court rejected the agreement as contrary to the public interest, and the trial continued.

¶ 3. To prove Trittin died from a heroin overdose, the State introduced testimony from chief medical examiner Douglas Kelly. Kelly testified about the autopsy he performed on Trittin, as well as toxicology test results generated by an out-of-state lab at his request. Near the beginning of his testimony, the State presented exhibit 5, which consisted of both the autopsy report and toxicology report.[3]

¶ 4. Both pages of the toxicology report bore the heading: "St. Louis University Toxicology Laboratory Report[,]" beneath which was a mailing address.[4] At the end of the toxicology report, there was a set-off area indicating: "Requested by: DR. KELLEY" at a certain date and time, "Received in Lab:" at a certain date and time, and "Report by: DR. CHRISTOPHER LONG" at a certain date and time. Beneath those three entries was a line containing a handwritten signature.

¶ 5. Kelly first testified about his external examination of Trittin, explaining there were various minor injuries such as abrasions and bruises. Additionally, he found one puncture wound on each arm. He testified:

> One of them had some tape on it and the other one didn't. Those could have been from medical intervention. ... I am fairly confident that the puncture wound to the right arm [with the piece of tape] is from medical intervention because with the transport bag there was an IV catheter set. ... The one to the left arm, however, I can't really say one way or the other

---

[3] One page of the toxicology report was initially missing, but it was later added as exhibit 5A.

[4] Both pages of the toxicology report also included Trittin's name, age, race, sex, and a file number.

whether . . . that was from medical intervention or some intravenous use of substances.

¶ 6. When asked whether he observed anything relevant to cause of death during the internal examination, Kelly explained:

Well, really some supportive evidence of what I felt was the cause of death. The lungs were heavy, a condition we call pulmonary edema. That's a . . . non-specific condition in which the air sacs of the lungs fill up with water and it can be found in a lot of different things including medication toxicities, drug toxicities. It can also be found in heart failure and things of that nature.

The brain was a bit swollen which suggested to me it was deprived of oxygen for a period of time and then as a result of the insult to the brain, it swelled up. It took on extra water in other words.

Beyond that there was [sic] no traumatic injuries. There was no other disease stance that was found so I found some supportive evidence on internal examination that supported the cause of death but nothing additional.

¶ 7. The State next inquired whether the toxicology results aided in determining the cause of death. Kelly explained there were numerous drugs in Trittin's system, but based on the levels of each in the blood and/or urine, he determined heroin toxicity was the sole cause of death. Specifically, he based his conclusion on the high concentration of morphine in the blood together with the presence of the heroin metabolite 6 MAM in the urine. Kelly explained: "But without any question that morphine is an extremely high level and so that's why I came to the conclusion I did that this was a death from opiate toxicity or heroin toxicity."

744

¶ 8. Neither the author of the toxicology report nor anyone else from the laboratory was produced as a witness.[5] However, the State did inquire why Kelly chose that particular laboratory. Kelly testified:

> Basically just it's the lab we have always sent toxicology specimens to. It is a very good, solid lab. They have a very experienced director who is board-certified in forensic toxicology and we've always had good cooperation from them in helping us with cases, helping us to get results on cases.

¶ 9. On cross-examination, Kelly was asked why the autopsy report was dated May 17, 2011, when he had conducted the examination on April 14. Kelly explained:

> Basically what happens is when I do the autopsy, if I don't find a cause of death, I'll write down my findings and let the coroner know about that, but what will happen is since I feel that we need to wait on toxicology, and I will say that even when we do find a cause of death in a lot of cases we still wait on toxicology before signing everything, but in this case since there was no cause of death, the toxicology specimens were sent out and we awaited the results before going forward . . . .

¶ 10. Ultimately, the jury found VanDyke guilty. He moved for postconviction relief, arguing trial counsel was ineffective for failing to object to introduction of the toxicology report. The trial court conducted a *Machner*[6] hearing, where trial counsel explained he

---

[5] The State did not present any chain-of-custody evidence regarding the toxicology samples, aside from Kelly's testimony that he sent the samples to the private lab and received results.

[6] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

did not object because he "did not necessarily view the report as adverse to our strategic position." Counsel testified the report suggested Trittin was a "junkie," which supported the argument that Trittin died from some other drug.

¶ 11. Trial counsel nonetheless recognized that the State relied on the toxicology report "for the purpose of establishing an element of the crime," namely that Trittin "had died of a heroin overdose." He could recall no "other evidence in the discovery that would have allowed the State to prove the toxicity of . . . Trittin's blood had [the] report been excluded" from evidence. In any event, counsel believed the report "would be able to be brought in through the witness who did testify." The court denied VanDyke's postconviction motion and VanDyke appeals.

## DISCUSSION

¶ 12. VanDyke argues his trial counsel rendered ineffective assistance. This claim requires proof that the attorney's performance was deficient and that the deficient performance prejudiced the defense. *State v. Thiel*, 2003 WI 111, ¶ 18, 264 Wis. 2d 571, 665 N.W.2d 305. To prove deficient performance, the defendant must establish that counsel's representation fell below an objective standard of reasonableness. *Id.*, ¶ 19. Further, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (source omitted). To demonstrate prejudice, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the pro-

ceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Stated otherwise, prejudice exists when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

¶ 13. Ineffective assistance of counsel claims present a mixed question of fact and law. The circuit court's factual findings will be upheld unless clearly erroneous. *State v. Manuel*, 2005 WI 75, ¶ 26, 281 Wis. 2d 554, 697 N.W.2d 811. Whether counsel's performance was deficient and prejudicial is a question of law reviewed de novo. *Id.*

¶ 14. VanDyke argues his attorney was ineffective for failing to object to introduction of the toxicology report, which he asserts violated his right to confrontation. Both the federal and state constitutions provide the accused with the right to confront the witnesses against him or her. *See* U.S. CONST. AMEND. VI; WIS. CONST. art. I, § 7. This fundamental protection requires the State to present its witnesses in court to provide live testimony subject to adversarial testing. *Crawford v. Washington*, 541 U.S. 36, 43 (2004). Out-of-court testimonial statements are barred by the Confrontation Clause unless the witness is unavailable and the accused had a prior opportunity to confront that witness. *Id.* at 68. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69.

¶ 15. The U.S. Supreme Court did not define "testimonial" in *Crawford*, but it identified three formulations of testimonial statements:

747

> [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.
>
> . . . .
>
> [E]xtrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.
>
> . . . .
>
> [S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52. The Wisconsin Supreme Court similarly recognizes all three formulations. *State v. Jensen*, 2007 WI 26, ¶ 18, 299 Wis. 2d 267, 727 N.W.2d 518 (citing *Manuel*, 281 Wis. 2d 554, ¶ 39).

¶ 16. "[C]ertifications by a laboratory of tests received as substantive evidence, or the testimony by someone who did not perform the tests received as substantive evidence may violate a defendant's right to confrontation." *State v. Heine*, 2014 WI App 32, ¶ 9, 354 Wis. 2d 1, 844 N.W.2d 409 (citing *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2709–10 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308, 311 (2009)). For example, in *Bullcoming*, the Court determined a laboratory report regarding the alcohol content of the defendant's blood was testimonial, despite the fact it was not sworn. *Bullcoming*, 131 S. Ct. at 2717. The report's "formalized" nature was demon-

748

strated by the facts that it was signed and was headed a "report." *Id.* Further, while experts may rely on inadmissible evidence, the confrontation clause prohibits an expert from acting as a mere conduit for the testimony of another. *See Heine*, 354 Wis. 2d 1, ¶ 13; *State v. Williams*, 2002 WI 58, ¶¶ 18–19, 253 Wis. 2d 99, 644 N.W.2d 919.

¶ 17. We agree with VanDyke that the laboratory report containing Trittin's blood and urine test results was testimonial. The document is substantially similar to that in *Bullcoming*; it set forth the analyst's findings, was titled as an official "report" from the university lab, and was hand signed. The document was further imbued with formality by the three date and time stamps set forth above the signature. Additionally, the analyst would reasonably expect that the document, which was requested by the medical examiner to aid in determining Trittin's cause of death, "would be available for use at a later trial."[7] *See Crawford*, 541 U.S. 36, 51–52.

¶ 18. The State first relies on *Williams v. Illinois*, 132 S. Ct. 2221 (2012), and *State v. Deadwiller*, 2013 WI 75, 350 Wis. 2d 138, 834 N.W.2d 362, to argue the laboratory report was nontestimonial. However, as

---

[7] The State misstates this standard in its brief, asserting that "under *Crawford*, the purpose of the report itself had to be in anticipation of litigation, not merely that a report could be used at some unknown trial." Rather, as set forth above, statements are testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004). Regardless, we have also concluded the toxicology report was testimonial because it was formalized material similar to an affidavit. *See id.*

*Deadwiller* recognized, *Williams* was a split case that offers no guidance in most cases. *Deadwiller*, 350 Wis. 2d 138, ¶¶ 30–32. Nonetheless, the *Deadwiller* court observed, "A fractured opinion mandates a specific result when the parties are in a 'substantially identical position.'" *Id.*, ¶ 30 (citation omitted).[8] It then explained, "Though the opinions . . . in *Williams* have no theoretical overlap, we still apply the case because Deadwiller and Williams are in substantially identical positions. . . . [I]n fact, the facts of this case are strikingly similar to the facts in *Williams*." *Id.*, ¶ 32.

¶ 19. The facts of *Williams* and *Deadwiller* are not similar to those here. For example, those were sexual assault/DNA cases, the laboratory report "was not introduced into evidence in either case[, and p]rosecutors in both cases introduced inventory reports, evidence receipts, and testimony to prove a chain of custody[.]" *Deadwiller*, 350 Wis. 2d 138, ¶ 32. Accordingly, as *Williams* and *Deadwiller* are narrowly limited to the facts of those cases, they are inapplicable here.

---

[8] In *Deadwiller*, our supreme court more fully explained:

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." This rule is applicable only when "at least two rationales for the majority disposition fit or nest into each other like Russian dolls." If no theoretical overlap exists between the rationales employed by the plurality and the concurrence, "the only binding aspect of the fragmented decision . . . is its 'specific result.'" "A fractured opinion mandates a specific result when the parties are in a "substantially identical position."

*State v. Deadwiller*, 2013 WI 75, ¶ 30, 350 Wis. 2d 138, 834 N.W.2d 362 (citations omitted).

¶ 20. The State alternatively argues *Heine* is dispositive. The facts in *Heine* are admittedly similar to the present case. Like here, *Heine* involved the issue of whether the defendant committed first-degree reckless homicide by delivering heroin that the victim used, causing death. *Heine*, 354 Wis. 2d 1, ¶ 1. Heinie argued admission of the toxicology report into evidence violated his confrontation rights because nobody involved in the toxicology analysis testified at trial. *Id.* Instead, the results came in through testimony from the medical examiner who performed the autopsy. *Id.*, ¶¶ 1, 5.

¶ 21. Despite the foregoing similarities, the medical examiner in *Heine* did not rely entirely on the laboratory results to determine the cause of death. Rather, the court explained:

> In the course of the autopsy, Dr. Tranchida noted that there were "four fresh punctures" in the front of the victim's elbow, as well as scarring from old punctures. He also found "white frothy foam" in the tube that had been used in an attempt to resuscitate the victim, that "the white frothy foam [went] all the way down deep into his airways, his trachea and his bronchi," and that the victim's lungs were "full of fluid." Dr. Tranchida also told the jury that the victim had an inordinate amount of urine in his bladder: in "my examination of [the victim]'s bladder I found that it was distended with urine. Most people tend to go to the bathroom when their urine—when the bladder starts to fill with about 200 milliliters of urine. He had 400 milliliters of urine, almost twice that amount."

*Id.*, ¶ 6 (brackets in *Heine*). The medical examiner further explained, in detail, why those observations led him to believe the victim died of heroin intoxication, although he also "testified that he read the toxicology laboratory report, and that he regularly relied on

toxicology results for, as phrased by the prosecutor's question, 'purposes of completing [his] final diagnosis.' " *Id.*, ¶ 7.

¶ 22. Ultimately, the court held, "Assuming without deciding that receipt of the toxicology report into evidence was error under both *Bullcoming* and *Melendez-Diaz*, . . . we agree with the State that the errors . . . were harmless beyond a reasonable doubt . . . ." *Heine*, 354 Wis. 2d 1, ¶ 14. It explained:

> As seen from our extensive review of Dr. Tranchida's testimony, he was no mere conduit for the toxicology report; rather, he fully explained why *he,* based on his education and experience, honed in on heroin as the cause of the victim's death: the fresh elbow punctures, the "white frothy foam" that extended "down deep into [the victim's] airways, his trachea and his bronchi," that the victim's lungs were "full of fluid," and the victim's inordinate retention of urine. It was perfectly reasonable and consistent with both Wis. Stat. Rule 907.03 and Heine's right to confront his accusers, for Dr. Tranchida to take into account the toxicology report in firming up his opinion as to why the victim died. . . . [T]he trial court's receipt of the toxicology report into evidence was harmless beyond a reasonable doubt because, as we have already noted, Dr. Tranchida could have given his opinion exactly as he gave it without referring to the report.

*Id.*, ¶ 15.

¶ 23. The State argues *Heine's* holding is applicable here because "the St. Louis lab results only confirmed and further cemented Dr. Kelly's opinion that Trittin died from a heroin overdose." Generically citing a six-page section of transcript, the State similarly asserts, "Kelly testified without contradiction that he identified Trittin's cause of death as a heroin overdose, and that he did so for reasons independent of

752

the lab results which later confirmed his diagnosis." Further, it argues, "VanDyke was not prejudiced because Dr. Kelly could have reached the same opinion without said report[.]"

¶ 24. Were the facts as the State proclaims, it would have a compelling *Heine* argument. However, the State's characterizations of the facts have no basis, no matter how many times the State repeats them. As set forth above, Kelly's autopsy examination did not lead him to Trittin's cause of death; cause remained undetermined following the autopsy. While a few of Kelly's examination findings were consistent with the later-determined cause of death, he testified the pulmonary edema was a nonspecific condition that could occur from "a lot of different things." Further, of the mere two punctures on Trittin's arm, Kelly was confident one was from medical intervention, and he had no opinion whether the other was from illicit drug use or medical intervention. Importantly, Kelly never testified he believed, prior to his review of the toxicology report, that heroin toxicity caused Trittin's death. It cannot reasonably be argued that Kelly's cause-of-death opinion was made independently of the toxicology report.

■■■■

¶ 25. The State was required to prove not only that VanDyke delivered heroin to Trittin, but that Trittin "use[d] the controlled substance . . . and die[d] as a result of that use." Wis. Stat. § 940.02(2)(a). The toxicology report directly proved Trittin's "use," and was the conclusive basis of Kelly's cause-of-death opinion. Yet, VanDyke was afforded no opportunity to cross-examine anyone from the laboratory, much less someone involved in the testing or the person who signed off on the official report. This violated Van-

Dyke's constitutional rights to confrontation. Further, because Kelly served as a mere conduit for the toxicology report and was unable to offer an independent cause-of-death opinion, the violation was prejudicial. *See Heine*, 354 Wis. 2d 1, ¶¶ 14–15.

¶ 26. We conclude trial counsel's failure to object to the deprivation of a fundamental constitutional right constituted deficient performance under the ineffective assistance of counsel rubric. We also reject the State's inadequately developed argument that counsel did not perform deficiently because the law was unsettled. *See State v. Flynn*, 190 Wis. 2d 31, 39 n.2, 527 N.W.2d 343 (Ct. App. 1994) (we may disregard issues that are inadequately briefed). The precedent set forth in *Crawford, Melendez-Diaz,* and *Bullcoming* existed at the time of VanDyke's December 2012 trial.[9] Given the subsequent *Williams* decision was fractured, trial counsel should have known he still had a viable confrontation objection under existing law.

¶ 27. Finally, the State argues counsel was not deficient and VanDyke was not prejudiced because VanDyke's trial counsel wanted the toxicology report admitted so as to argue another drug or drugs killed Trittin. This argument falls flat. It assumes that objecting to the report's admission forever barred Van-Dyke from arguing based on the report. However, if the objection were successful, such argument would have been unnecessary because the State could not prove its case. Indeed, during the *Machner* hearing, trial counsel recognized that, if the report had been excluded,

---

[9] In contrast, two of the three primary cases the State relies on were decided after VanDyke's trial. *See State v. Heine*, 2014 WI App 32, 354 Wis. 2d 1, 844 N.W.2d 409 (decided Jan. 2014); *Deadwiller*, 350 Wis. 2d 138 (decided July 2013).

the State would not have been able to prove by other evidence the toxicology of Trittin's blood. Alternatively, if the State was able to introduce the results of the report, due to a continuance or otherwise, VanDyke could still make his other-drugs argument at that time.[10]

¶ 28. Trial counsel's deficient performance prejudiced VanDyke's defense. There was a reasonable probability of a different outcome had counsel objected. Indeed, the toxicology report was critical to the State's case. Furthermore, the parties came to a plea agreement in the midst of trial. Had counsel made a successful confrontation objection, the trial court might well have accepted the agreement.

*By the Court.*—Judgment and order reversed and cause remanded.

[10] Moreover, we question the reasonableness of such a strategy in the first instance. Kelly testified there were no other drugs present in concentrations high enough to have contributed to Trittin's death, much less to have independently caused it, and it does not appear any expert testified otherwise. The jury only needed to conclude the heroin was a "substantial factor" contributing to Trittin's death. *See State v. Below*, 2011 WI App 64, ¶¶ 26–27, 333 Wis. 2d 690, 799 N.W.2d 95.