# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP158-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>            Plaintiff-Respondent, <br>      v. <br> Rozerick E. Mattox, <br>            Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | February 14, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 26, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Jennifer Dorow |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, J., joined by BRADLEY, A. W., J. dissent (Opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant, there was a brief and oral argument by *Leon W. Todd*, assistant state public defender.

For the plaintiff-respondent the cause was argued by *Luke N. Berg*, deputy solicitor general, with whom on the brief was *Misha Tseytlin*, solicitor general and *Brad D. Schimel*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2015AP158-CR
(L.C. No.   2013CF471)

STATE OF WISCONSIN                :      IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent,**

    **v.**

**Rozerick E. Mattox,**

    **Defendant-Appellant.**

**FILED**

**FEB 14, 2017**

Diane M. Fremgen
Clerk of Supreme Court

APPEAL from a judgment of the Circuit Court for Waukesha County, Jennifer Dorow, Judge. *Affirmed.*

¶1   REBECCA GRASSL BRADLEY, J.   The court of appeals certified this case to the court to determine whether the admission of a toxicology report through a medical examiner's testimony violated Rozerick E. Mattox's Sixth Amendment right to confrontation.   After a bench trial,[1] Mattox was convicted of

---

[1] The Honorable Jennifer R. Dorow of Waukesha County presided.

first-degree reckless homicide for delivering heroin that caused S.L.'s death.[2] Specifically, the certified question asks:

> Does it violate a defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution for the State to introduce at trial a toxicology report identifying certain drugs in a deceased victim's system and/or testimony of a medical examiner basing his/her cause-of-death opinion in part on the information set forth in such a report, if the author of the report does not testify and is not otherwise made available for examination by the defendant?

¶2 The certification explains that two recent court of appeals decisions reached opposite conclusions in heroin overdose homicide cases involving toxicology reports. See State v. Heine, 2014 WI App 32, 354 Wis. 2d 1, 844 N.W.2d 409; State v. VanDyke, 2015 WI App 30, 361 Wis. 2d 738, 863 N.W.2d 626. During the underlying trials in both Heine and VanDyke, the toxicology reports were used during testimony by the medical examiners who performed the autopsies and relied on the toxicology reports to determine the cause of death in each case. The lab analyst who signed the toxicology reports did not testify. In Heine, the court of appeals held the toxicology report could be used without violating the confrontation right. Id., 354 Wis. 2d 1, ¶¶1, 15. But in VanDyke, it held the

---

[2] Mattox was convicted under Wis. Stat. § 940.02(2)(a) (2011-12), which defines first-degree reckless homicide in pertinent part as: "Whoever causes the death of another human being . . . [b]y manufacture, distribution or delivery, in violation of s. 961.41, of a controlled substance . . . if another human being uses the controlled substance . . . and dies as a result of that use."

2

toxicology report was "testimonial"; therefore, according to the court of appeals, the report's admission through the medical examiner's testimony violated the Confrontation Clause under Crawford v. Washington, 541 U.S. 36 (2004) (admission of "testimonial" out-of-court statements without affording the defendant the opportunity to cross-examine the declarant violates the Confrontation Clause). VanDyke, 361 Wis. 2d 738, ¶¶14-17. The certification notes that neither Heine nor VanDyke sought review in this court but that "a supreme court decision could lay this issue to rest for the bench and bar."

¶3 We answer the certified question in the negative and therefore overrule VanDyke. Admitting this type of toxicology report and the medical examiner's related testimony does not violate a defendant's confrontation right because the toxicology report was not "testimonial" under the primary purpose test recently set forth by the United States Supreme Court in Ohio v. Clark, 135 S. Ct. 2173 (2015). Under that test, when the statement's primary purpose is something other than to "creat[e] an out-of-court substitute for trial testimony" its admission does not implicate the Confrontation Clause. Id. at 2180, 2183 (quoting Michigan v. Bryant, 562 U.S. 344, 358 (2011)).

¶4 The primary purpose of the toxicology report in this case was to assist the medical examiner in determining the cause of death. All objective indicators show the report was not created for an evidentiary purpose: (1) the medical examiner testified she requested the toxicology analysis as a part of her autopsy protocol; (2) the toxicology report was not sworn,

3

certified, or in the form of an affidavit and it comprised only numerals quantifying the concentration of substances contained in S.L.'s blood, urine, and tissue samples without any analysis or interpretation of those numbers; (3) the police were not involved in the autopsy or toxicology requests; (4) the report was not requested by or reported directly to law enforcement; (5) according to the record, the analyst who signed the report had no knowledge the report related to a crime; and (6) the report did not give an opinion on the cause of death or any element of the crime for which Mattox was charged. Accordingly, the admission and use at trial of this toxicology report did not violate Mattox's Sixth Amendment right to confrontation.[3] We affirm the judgment convicting Mattox.

## I. BACKGROUND

¶5 At about 2:30 a.m. on February 15, 2013, S.L.'s roommate wanted to talk to S.L. and tried to get S.L. to open his locked bedroom door. After receiving no response, the roommate broke open the door to the bedroom, where he found S.L. deceased.

¶6 City of Waukesha police and a Waukesha County deputy medical examiner came to the apartment. They found S.L. hunched over on the bedroom floor with drug paraphernalia on a chair nearby. They also found some non-prescription ibuprofen and

---

[3] Mattox does not raise any other ground for possible exclusion of the toxicology report; thus, our review is limited to whether its admission violated the Confrontation Clause.

prescription Clonazepam, a drug used to treat anxiety. Waukesha County Deputy Medical Examiner, Nichol Wayd, spoke with police at the scene to get background facts, took pictures, and transported S.L.'s body to the morgue for an autopsy.

¶7 After the body was removed from the scene, the police, under the supervision of City of Waukesha Detective Thomas Casey, collected the drug paraphernalia from S.L.'s room, including multiple syringes (one of which had been used recently), a small metal cooker, a tourniquet, and some cotton balls. These items were submitted to the State Crime Lab for analysis.

¶8 On February 15, 2013, Dr. Zelda Okia, an associate medical examiner for Waukesha County, performed the autopsy on S.L.'s body in order to determine the cause of death. The autopsy protocol included examining the body and collecting and sending biological samples to a toxicology lab. The Waukesha County Medical Examiner's Office used the St. Louis University toxicology lab because a board certified toxicologist runs the lab and Waukesha County does not have the equipment to conduct its own toxicology tests. During the autopsy, Dr. Okia noted pulmonary edema, cerebral edema, 13 recent needle puncture marks in S.L.'s arms, and elevation in the weight of his lungs——all signs indicating death caused by drug overdose. Dr. Okia collected samples of S.L.'s blood, urine, and tissue near the injection sites, as well as one control tissue sample. She sent these samples to the toxicology lab with the following information: (1) S.L.'s name, age, weight, and race; (2) a

5

history reading "Found unresponsive at Home"; (3) a listing of medications available as "Clonazepam, Ibuprofen"; and (4) a request to "Please test all above specimens" for "Alcohol" and "General Unknown." The lab received the specimens on February 19, 2013, and the toxicology report was completed on March 13, 2013.

¶9 The toxicology report, which is attached in the Appendix, lists the substances for which each sample was tested, as well as either the word "negative" or "positive." A number appears next to any substance identified within the sample. As pertinent here, the toxicology report indicates the following: The blood sample contained:

- "0.61 MICROGRAMS/ML" of total morphine;
- "LESS THAN 0.05 MICROGRAMS/ML" of "6-MONOACETYLMORPHINE"; and
- "0.27 MICROGRAMS/ML" of free morphine.

The urine sample contained:

- "0.74 MICROGRAMS/ML" of codeine;
- "GREATER THAN 4 MICROGRAMS/ML" of morphine;
- "2.5 MICROGRAMS/ML" of "6-MONOACETYLMORPHINE"; and
- "0.13 MICROGRAMS/ML" of hydromorphone.

The tissue samples, including the control sample, all contained measurable amounts of morphine:

- "0.28 MICROGRAMS/GM" in "Antecubital vein and fat";
- "0.14 MICROGRAMS/GM" in "Right anterior forearm vein and fat";

6

- "0.16 MICROGRAMS/GM" in "Right ventral forearm vein and fat";

- "0.11 MIRCROGRAMS/GM" in "Right anterior forearm vein and fat"; and

- "0.14 MIRCROGRAMS/GM" in "Left antecubital vein and fat."

Dr. Christopher Long signed the toxicology report but the report was not sworn or certified and does not contain any affidavit-like assertions.  The report does not explain the significance of any of the numbers nor does it provide an interpretation of the chemical levels.

¶10 Upon receiving the toxicology report, Dr. Okia completed her autopsy report.  Although the autopsy report is not dated, it must have been completed after March 13, 2013, because it lists the blood sample morphine quantities from the toxicology report.  Dr. Okia's autopsy report concludes that S.L.'s cause of death was "Acute Heroin Intoxication."  The autopsy report does not indicate any police involvement with the autopsy or the toxicology lab.  The police were not involved in requesting, sending, or receiving the biological samples from or to the toxicology lab.

¶11 The City of Waukesha Police investigation into S.L.'s death proceeded independently from the county medical examiner's office.  The only connection in this record between the medical examiner's office and the police is the fact that both responded to the scene and together notified S.L.'s next of kin of his death.  Dr. Wayd also sent to police her investigative report, which is required in all State

7

investigations and routinely produced.  The report contains a summary of the medical examiner's observations from the scene and it documents the notification of S.L.'s next of kin regarding his death.

¶12 The independent police investigation resulted in a conclusion by law enforcement that S.L. died from an overdose of heroin supplied by Mattox.  The State Crime Lab certified, in an October 2013 report, that the recently used syringe and metal cooker police collected from S.L.'s apartment tested positive for the presence of heroin.  Cell phone and financial records, bank video surveillance, and interviews with S.L.'s family and friends enabled police to retrace S.L.'s steps the day before his death.  This led police to S.L.'s friend, Terry Tibbits. Ten days after S.L.'s death, the police spoke with Tibbits, who admitted he helped S.L. buy heroin from Mattox mid-morning on February 14, 2013.  Video surveillance from a bank ATM confirmed Tibbits' report that the two withdrew $100 from S.L.'s bank account shortly before meeting with Mattox.  Tibbits told police he gave $80 of S.L.'s ATM withdrawal to Mattox in exchange for a half gram of heroin.  After the heroin purchase, Tibbits and S.L. immediately used 25 percent of the half gram, and S.L. kept the rest.  The police learned from Tibbits that he regularly bought heroin from Mattox, a fact police confirmed when Tibbits arranged for a controlled buy of heroin from Mattox on March 8, 2013.  After the controlled buy, police arrested Mattox for selling heroin.  During police questioning, Mattox admitted he sold Tibbits heroin two to three times a week, but claimed he

8

did not remember whether Tibbits bought heroin from him on February 14, 2013.

¶13 The police obtained cell phone records for Tibbits, Mattox, and S.L., which supported the details Tibbits told police. From additional interviews with S.L.'s family and friends, police learned that S.L. was a heroin addict, had been arrested for heroin possession earlier that month, and had a court appearance related to that arrest the afternoon of February 14, 2013. Police also learned that S.L.'s regular heroin supplier was in jail and S.L. had been trying to stop using heroin.

¶14 After being charged in April 2013 with reckless homicide for S.L.'s death, Mattox pled not guilty and the case was tried to the court. At trial, Mattox did not deny that he regularly sold heroin to Tibbits, but he insisted he had not done so on February 14, 2013. He did not dispute that S.L. died from ingesting heroin; rather, he argued that S.L. bought the deadly heroin from some other heroin dealer.

¶15 At trial, Dr. Okia explained the autopsy procedure in a suspected overdose situation where the cause of death is unknown. The procedure requires collecting biological specimens to be sent to the toxicology lab for analysis. When the prosecutor asked Dr. Okia about the toxicology report, Mattox objected to its admission on the grounds that it violated his

right to confrontation.[4] The circuit court overruled the objection, holding that the toxicology report was admissible under Wis. Stat. § 907.03 (2011-12)[5] as a basis for expert opinion testimony and because it was not being admitted for its truth or to prove an element of the crime. The circuit court limited the admission of the report accordingly.

¶16 Dr. Okia testified that her cause of death determination was based on her observations made during the autopsy as well as the toxicology results she reviewed. She testified:

- 0.61 micrograms per milliliters of morphine in the blood is a fatal amount; although the toxicology report did not state this, she knew it from her training and experience.

- Less than 0.05 micrograms per milliliters of 6-monoacetylmorphine (6-MAM for short) in the blood is specific for heroin; it means the morphine in the blood came from heroin and could not have come from any other substance.

---

[4] Mattox did not object to the admission of the lab reports finding the presence of heroin on the drug paraphernalia collected from S.L.'s bedroom and finding that the substance seized during the March 8, 2013 controlled drug buy was heroin. He stipulated to the admission of those Wisconsin State Crime Lab reports without requiring the lab analysts to testify at trial.

[5] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

- 0.27 micrograms per milliliters of free morphine in the blood is "actual active morphine" and is a fatal amount; the toxicology report did not explain this but she knew it from her training and experience.

¶17 Dr. Okia also testified about the other numbers in the toxicology report. She explained that the codeine in S.L.'s urine is a contaminant often found in heroin cases because codeine is used to manufacture heroin. She further explained, however, that substances detected in urine indicate the presence of the substances but cannot be used to determine the cause of death because "urine typically concentrates the drugs." She looks only for "active drugs in the blood" in assessing cause of death.

¶18 The circuit court found Mattox guilty. He appealed to the court of appeals, claiming that admission of the toxicology report, without testimony at trial by the analyst who signed it, violated his right to confrontation. The court of appeals certified the case to this court, and we accepted it for review.

## II. ANALYSIS

### A. Standard of Review

¶19 Whether the admission of the toxicology report and the medical examiner's testimony based upon it violates Mattox's Sixth Amendment right to confrontation is a question of constitutional law subject to independent review. See State v. Williams, 2002 WI 58, ¶7, 253 Wis. 2d 99, 644 N.W.2d 919.

¶20 Both the Sixth Amendment to the United States Constitution and the Wisconsin Constitution guarantee a criminal

11

defendant the right to confront witnesses who testify against the defendant at trial. See U.S. Const. amend. VI; Wis. Const. art. 1, § 7.[6] "We generally apply United States Supreme Court precedent when interpreting these clauses." State v. Jensen, 2007 WI 26, ¶13, 299 Wis. 2d 267, 727 N.W.2d 518 (2007).

### B. Precedent

¶21 This case presents an issue of first impression that neither this court nor the United States Supreme Court has directly addressed. Since the Supreme Court decided Crawford v. Washington, 541 U.S. 36 (2004), we have issued only two opinions involving the application of the Confrontation Clause to forensic lab reports, and neither opinion involved a toxicology report requested by the medical examiner as a part of an autopsy to determine the cause of death where a crime had not yet been uncovered. See State v. Griep, 2015 WI 40, 361 Wis. 2d 657, 863 N.W.2d 567; State v. Deadwiller, 2013 WI 75, 350 Wis. 2d 138, 834 N.W.2d 362.

¶22 Griep involved a drunk-driving prosecution where an expert witness relied on a blood alcohol lab report certified by an analyst who was not available to testify at trial. The report was not admitted, but an expert witness reviewed the lab

---

[6] The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article I, Section 7 of the Wisconsin Constitution states: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face . . . ."

report and testified about the blood alcohol result it reported. We held Griep's confrontation right was not violated because the expert merely reviewed the lab report to form an independent opinion to which the expert testified.  See Griep, 361 Wis. 2d 657, ¶¶1-3.  The holding in Griep did not depend on whether the report itself was testimonial because the report was not admitted into evidence.

¶23 Deadwiller involved a sexual assault prosecution where an expert witness used a DNA profile created by an out-of-state lab using vaginal and cervical swabs from the victim to form an independent conclusion.  Deadwiller, 350 Wis. 2d 138, ¶¶1, 40. Deadwiller challenged the testimony of the State Crime Lab analyst who entered the DNA profile into the DNA database and found it matched Deadwiller.  Id., ¶40.  Relying on Williams v. Illinois, 567 U.S. ___, 132 S. Ct. 2221 (2012), a plurality opinion with facts substantially identical to those in Deadwiller, we determined no confrontation violation occurred. Deadwiller, 360 Wis. 2d 138, ¶¶1-2.  Significantly, the defendant in Deadwiller did not contest the very fact supported by the DNA profile——that he had intercourse with the victims—— rather, the defendant testified that the victims consented. Id., ¶36.  Neither Griep nor Deadwiller is squarely on point here.

¶24 Likewise, the Supreme Court has not yet addressed the issue presented in this case.  Unquestionably, the Court substantially changed confrontation jurisprudence when it decided Crawford in 2004.  See Clark, 135 S. Ct. at 2179.  The

13

Crawford Court overruled the Confrontation Clause test articulated in Ohio v. Roberts, 448 U.S. 56 (1980), which had allowed admission of out-of-court statements exhibiting "adequate indicia of reliability" if the statement either fell "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." See Crawford, 541 U.S. at 40; Clark, 135 S. Ct. at 2179 (quoting Roberts, 448 U.S. at 66). Crawford returned confrontation law to its original meaning and held a defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial if those statements are "testimonial" and the defendant has not had "a prior opportunity" to cross-examine the out-of-court declarant. Crawford, 541 U.S. at 68. The Crawford Court did not provide a comprehensive definition of "testimonial," but it concluded that, "at a minimum," "testimonial" statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial and . . . police interrogations" because these are the types of evidence "at which the Confrontation Clause was directed." Id. Crawford's definition of "testimonial" required the statement to have some degree of formality. See id. at 51. Post-Crawford, confrontation challenges begin with an analysis of whether the out-of-court statements used against a defendant are "testimonial." If the statements are not testimonial, the Confrontation Clause is not implicated.

14

¶25 Since Crawford, the Supreme Court decided several confrontation cases in a variety of contexts and further defined whether statements are or are not "testimonial." See Davis v. Washington, 547 U.S. 813, 822 (2006) (establishing that statements "are nontestimonial when made . . . under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" (emphasis added)); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009) (concluding that affidavit-like certifications, which proved the fact in question——that a seized substance was cocaine——were testimonial because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination'" (quoting Davis, 547 U.S. at 830)); Michigan v. Bryant, 562 U.S. 344, 377-78 (2011) (holding that statements made by a dying shooting victim were nontestimonial where informal nature of police questioning demonstrated officers' primary purpose of assessing the situation and responding to ongoing emergency); Bullcoming v. New Mexico, 564 U.S. 647, 664-65 (2011) (treating a lab report regarding defendant's blood-alcohol content as testimonial because, despite the absence of notarization, the author's certification was a formal, signed report "created solely for an 'evidentiary purpose' . . . [and] made in aid of a police investigation" (quoting Melendez-Diaz, 557 U.S. at 311)); Williams v. Illinois, 567 U.S. ___, 132 S. Ct. 2221, 2243 (2012) (plurality opinion) (concluding that DNA profile generated from sexual assault victim's vaginal swabs was

15

not testimonial because its "primary purpose . . . was not to accuse [the suspect] or to create evidence for use at trial"); Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015) (determining that child abuse victim's statements to teacher were not testimonial because the informal questions at a school were asked with a primary purpose as a "concerned citizen . . . talk[ing] to a child who might be the victim of abuse," not "to gather evidence for . . . prosecution").

## C. Application

¶26 Three of these Supreme Court cases discussed the Confrontation Clause within the context of forensic lab reports: Melendez-Diaz, Bullcoming, and Williams. Melendez-Diaz involved cocaine drug dealing where the challenged evidence comprised "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." Melendez-Diaz, 557 U.S. at 307-08. Bullcoming involved a drunk-driving arrest where the forensic lab report was created at the request of and for the "aid of a police investigation," "solely for an 'evidentiary purpose.'" Bullcoming, 564 U.S. at 651, 664 (quoting Melendez-Diaz, 551 U.S. at 311). The lab report certified Bullcoming's blood-alcohol concentration, the chain of custody of the blood sample, the qualifications of the analyst, the lab procedures, and that all procedures had been followed. Id. at 653. The Court held both lab reports were testimonial and their admission, without the opportunity to cross-examine the authors, violated the

16

Confrontation Clause. See Melendez-Diaz, 557 U.S. at 311; Bullcoming, 564 U.S at 663-65.

¶27 Melendez-Diaz and Bullcoming do not control here because the lab report and its evidentiary use in Mattox's case bear no resemblance to the reports or their use in Melendez-Diaz or Bullcoming. First, the forensic reports in Melendez-Diaz and Bullcoming were requested by police following the seizure of evidence from a criminal suspect, and the lab reports were specifically created for use against the suspects in criminal prosecutions. See Melendez-Diaz, 557 U.S. at 310-11; Bullcoming, 564 U.S. at 651, 664-65. Second, the Melendez-Diaz and Bullcoming reports satisfied the formality factor because each report was affidavit-like or certified——providing the functional equivalent of trial testimony——significantly, about an element of the crime in each case. In Melendez-Diaz, the Supreme Court concluded that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of court affidavits." Melendez-Diaz, 557 U.S. at 329.

¶28 Here, the medical examiner took biological samples during an autopsy of a decedent who died of unknown causes. The police did not seize the tested evidence from Mattox, who was not suspected of committing a crime when the samples were taken. The toxicology report was not requested by the police or solicited for the purpose of generating evidence against Mattox. At the time the medical examiner sent the samples for testing, there was no defendant against whom to generate evidence because there was no known crime. The medical examiner was simply

17

looking for information to determine the cause of death and submitted the biological samples to the toxicology lab pursuant to autopsy protocols. The police were not involved in sending the samples to the lab or generating evidence against a defendant with respect to the autopsy, and the record is devoid of any suggestion that the medical examiner was working as an agent of the police in an active criminal investigation to develop evidence for use in a criminal prosecution.

¶29 Further, the toxicology report in this case lists the concentration of the various substances present in S.L.'s biological samples sent for testing. The numbers in the report relate to S.L., not Mattox. Unlike in Melendez-Diaz and Bullcoming, the analyst who signed the report was not acting as a witness against Mattox and was not offering testimony with the primary purpose of saying that the heroin Mattox sold to S.L. killed him. The toxicology report does not even contain the word "heroin," and the report does not accuse Mattox of anything. Based on these significant differences, Melendez-Diaz and Bullcoming are easily distinguishable.

¶30 Williams is the third Supreme Court case addressing confrontation rights where a forensic lab report was used at trial without the testimony of the author of the report. The Williams case involved a sexual assault where the defendant claimed that use of a DNA profile violated his confrontation rights. See Williams, 132 S. Ct. at 2227. A four-Justice plurality concluded the DNA report was not testimonial because it had been prepared not "for the primary purpose of accusing a

18

targeted individual" but to "catch a dangerous rapist who was still at large." Id. at 2243. Because Williams does not have precedential value except in a case with substantially similar facts, it does not apply here. See Griep, 361 Wis. 2d 657, ¶39.

¶31 Thus, none of the Supreme Court's confrontation cases specifically discuss the Confrontation Clause within the context of the issue presented here: whether a toxicology report—prepared at the medical examiner's request as a part of the autopsy protocol in a drug overdose death—constitutes testimony in a homicide prosecution against the dealer who supplied the heroin responsible for the fatal overdose.

¶32 Ohio v. Clark, 135 S. Ct. 2173, guides our review. Although Clark did not involve a toxicology report prepared as a part of an autopsy, it pronounces the controlling principles in determining whether an out-of-court statement is "testimonial" and therefore subject to the Confrontation Clause. Clark reaffirms the primary purpose test: the dispositive "question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358). The primary purpose test decides whether the declarant is acting as a witness against the defendant, see Clark, 135 S. Ct. at 2185 (Scalia, J., concurring), by considering whether the primary purpose of the out-of-court statement "was to gather evidence for [the defendant's] prosecution." Id. at 2181. Clark instructs that some factors relevant in the primary

19

purpose analysis include: (1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant[7] and (4) the context in which the statement was given. Id. at 2180-82.

¶33 In order to decide whether the declarant in this case——the analyst who signed the toxicology report——was acting as a witness against Mattox, we must apply the primary purpose test. We start by examining the purpose of the toxicology report. Dr. Okia testified that, as a routine part of her autopsy protocol in suspected overdose cases, she collects biological specimens and sends them to the toxicology lab for testing to determine what substances, if any, are present in a decedent's blood, urine, and tissue. The reason for the testing is to inform the medical examiner's opinion as to the cause of death. Thus, the primary purpose of the toxicology report here was to provide information to the medical examiner as part of the autopsy protocol, not to establish certain toxicology levels in order to prove an element of a criminal charge. Indeed, no charges were pending or contemplated against Mattox at the time the medical examiner requested this toxicology report. Because the toxicology report was not intended to substitute for testimony

---

[7] This factor, though pertinent in Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015), is not applicable here and will not be discussed.

20

in a criminal prosecution, the report's primary purpose very clearly is not testimonial.

¶34 Another factor to consider in making the primary purpose determination is the "informality of the situation." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 377). A formal out-of-court statement is considered more likely to be testimonial, and an informal one is considered less likely to be testimonial. As a part of this analysis, Clark looked at whether the statements at issue were given to law enforcement officers or non-law enforcement individuals. Id. at 2181. Clark stopped short of adopting a "categorical rule" that statements to non-law enforcement individuals will never implicate the Confrontation Clause, but the Court held that statements to persons other than law enforcement officers were "much less likely to be testimonial than statements to law enforcement officers." Id. The toxicology report at issue in Mattox's case was not prepared for or given to law enforcement, making it much less likely to be testimonial. Although the toxicology report is "formal" in the sense that it is typewritten, titled, and signed, this slight formality does not imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might.

¶35 The facts in the record provide additional context, which Clark teaches is "highly relevant" to the primary purpose analysis in confrontation cases. See Clark, 135 S. Ct. at 2182. The declarant created the report at the request of the medical examiner, not the police, to provide the medical examiner with

21

the numerical concentration of substances, if any, present in the decedent's biological samples. The report was generated to help the medical examiner determine S.L.'s cause of death, not to help the police produce evidence for a criminal prosecution. Nothing in the record suggests the declarant knew that the police were conducting a simultaneous investigation into S.L.'s death or that the police would eventually conclude that a crime occurred. To the contrary, the information provided to the toxicology lab declarant gave no indication that S.L.'s death would prompt a homicide prosecution or that police were involved in any way. The specimens came from the medical examiner's office with information that S.L. was found "unresponsive at home" with Clonazepam and ibuprofen nearby. Under Wis. Stat. §§ 979.02 and 979.04, a medical examiner has broad, independent discretion to conduct an autopsy "for the purpose of inquiring how the person died" if there are "unexplained or suspicious circumstances" accompanying the death, see also Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 684, 292 N.W.2d 816 (1980), and, as the State points out, homicides account for "less than one percent" of the 1300 deaths the Waukesha County Medical Examiner's Office investigates each year.

¶36 Context shows the primary purpose of the toxicology report was to provide the medical examiner with the results of tests performed on the biological specimens of an individual who died for unknown reasons. It was not to aid police in a criminal investigation or to prove an element of a later-charged crime; it was not created as a substitute for out-of-court

22

testimony to prove Mattox killed S.L.  Mattox did not dispute any fact conveyed by the toxicology report, instead basing his defense on the theory that S.L. bought the heroin that killed him from another dealer.  A toxicology report used as a partial foundation for a medical examiner's cause of death determination——a report lacking any accusation or basis therefor against the defendant——is not the type of evidence "at which the Confrontation Clause was directed."  See Crawford, 541 U.S. at 68.

¶37  Applying all the pertinent Clark factors in this case results in a single conclusion:  the toxicology report in this case was not "testimonial" because its primary purpose was to identify the concentration of the tested substances in biological samples sent by the medical examiner as a part of her autopsy to determine the cause of death——not to create a substitute for out-of-court testimony or to gather evidence against Mattox for prosecution.  Use of this toxicology report during trial did not infringe Mattox's confrontation right.

D.  General Declaration on Autopsies and Toxicology Reports

¶38  The State asks this court to declare that, in general, admitting autopsy reports and any underlying toxicology reports will not violate a defendant's confrontation right because these types of reports do not generate testimonial evidence.  The State asserts this is so because the primary purpose of autopsies is to determine cause of death and not to generate evidence against a criminal defendant.  Although the Supreme Court has not declared this to be the law, the State cites a

23

variety of court decisions supporting its proposition.  See United States v. James, 712 F.3d 79, 87-102 (2d Cir. 2013) ("autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"); People v. Leach, 2012 IL 111534, ¶¶76-138, 980 N.E.2d 570 (autopsy report not testimonial because it was not "prepared for the primary purpose of accusing a targeted individual" or for "providing evidence in a criminal case" (citations omitted)); State v. Maxwell, 2014-Ohio-1019, ¶¶54-65, 9 N.E.3d 930 (autopsy reports are not testimonial because "they are created 'for the primary purpose of documenting cause of death for public records and public health'" (quoting Carolyn Zabrycki, Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Calif. L. Rev. 1093, 1130 (2008))).  The State acknowledges that some courts have held autopsies "testimonial," but the State asserts this occurred only under special circumstances, such as when law enforcement is physically present at the autopsy or leans heavily on the medical examiner to produce reports favoring prosecution against a criminal defendant.  See, e.g., United States v. Moore, 651 F.3d 30, 73 (D.C. Cir. 2011) (ruling autopsy report testimonial where police "observed the autopsies" and "participated in the creation of reports"); State v. Navarette, 294 P.3d 435, 440 (N.M. 2013) (ruling autopsy report testimonial where "two police officers attended the autopsy").

¶39 We decline the State's request.  The medical examiner who performed the autopsy in this case testified at trial,

24

eliminating any confrontation argument with respect to the autopsy report itself. A declaration on autopsies is not presented under the circumstances in this case.

¶40 We do declare a general rule with respect to the type of toxicology report at issue here. When a medical examiner——unilaterally and not in conjunction with law enforcement——requests a toxicology report while performing an autopsy to determine the cause of death, admitting the toxicology report generally will not violate the Confrontation Clause when the toxicology report contains solely a numerical account of the concentration of substances within a decedent's blood, urine, and tissue. The primary purpose of toxicology reports generated and used under circumstances similar to those presented in this case is not to generate evidence against a defendant in a criminal prosecution but to assist the medical examiner in determining the cause of death. Because admission of this type of toxicology report bears no "resemblance to the historical practices that the Confrontation Clause aimed to eliminate,"[8] such reports generally will not be "testimonial" and therefore will not trigger confrontation concerns.

### III. CONCLUSION

¶41 This case presented an issue of first impression: whether an out-of-state toxicology report requested by a medical examiner as a part of the routine autopsy protocol in a drug

---

[8] Michigan v. Bryant, 562 U.S. 344, 379 (2011) (Thomas, J., concurring in the judgment).

overdose death constitutes testimonial evidence in the resulting homicide prosecution against the drug dealer who supplied the heroin responsible for the fatal overdose. Guided by the Supreme Court's most recent confrontation case, Ohio v. Clark, 135 S. Ct. 2173, which requires application of the "primary purpose" test, we conclude the toxicology report here is not "testimonial" and its use at trial therefore did not infringe upon Mattox's confrontation right. We overrule the court of appeals' decision in State v. VanDyke, 361 Wis. 2d 738, because the court of appeals erroneously held a substantially similar toxicology report to be "testimonial." Id., ¶17.

¶42 We decline the State's request to declare all autopsy reports, absent special circumstances, to be non-testimonial because that is not the issue presented here. We do, however, hold that all toxicology reports similar to the one here——solely identifying the concentration of substances present in biological samples sent by the medical examiner as a part of an autopsy protocol——are generally non-testimonial when requested by a medical examiner and not at the impetus of law enforcement. The primary purpose of these toxicology reports is not to create evidence against a defendant in a criminal prosecution; rather, the principal purpose is to provide information to the medical examiner searching for the cause of death. Because there was nothing "testimonial" about the toxicology report used during Mattox's trial, the confrontation rights of the defendant were not infringed.

26

*By the Court.*—The judgment of the circuit court is affirmed.

APPENDIX

St. Louis University Toxicology Laboratory Report
6059 N. Hanley Road, Berkeley, Missouri 63134

Name: REDACTED                                     Tox # 2013-1255
  Age: 27 years              Race: White           Sex: Male

  Requesting Agency: WAUKESHA COUNTY MEDICAL EXAMINER
================================================================
 Blood:

    Alcohol:
      Ethanol: _____ Negative
      Acetone: _____ Negative
      Isopropanol: _____ Negative
      Methanol: _____ Negative

    Blood Drug Screen:
      Amphetamines: _____ Negative
      Antidepressants: _____ Negative
      Barbiturates: _____ Negative
      Benzodiazepines: _____ Negative
      Cannabinoids (THC): _____ Negative
      Cocaine/Metabolites: _____ Negative
      Lidocaine: _____ Negative
      Methadone: _____ Negative
      Non-Opiate Narcotic Analgesic: _____ POSITIVE
      OPIATES: _____ Negative
      Phencyclidine: _____ Negative
      Phenothiazines: _____ Negative
      Propoxyphene: _____ Negative
      Acetaminophen: _____ Negative
      Salicylates: _____ Negative
      Oxycodone: _____ Negative
      Fentanyl: _____ Negative
      Oxymorphone: _____ Negative

    Opiate Quantitation:
      Codeine: _____ Negative
      MORPHINE (TOTAL): _____ 0.61 MICROGRAMS/ML
      6-MONOACETYLMORPHINE: ___ LESS THAN 0.05 MICROGRAMS/ML
      Hydrocodone: _____ Negative
      Hydromorphone: _____ Negative
      Oxycodone: _____ Negative
      Dihydrocodeine (Hydrocodol): _____ Negative
      Oxymorphone: _____ Negative
      MORPHINE (FREE): _____ 0.27 MICROGRAMS/ML

  Urine:

    Urine Opiate Quantitation:
================================================================





STATE'S
EXHIBIT
#2
6-21-13 8A

St. Louis University Toxicology Laboratory Report
6059 N. Hanley Road, Berkeley, Missouri 63134

Name: REDACTED                                          Tox # 2013-1255
 Age: 27 years              Race: White                Sex: Male

Urine:  (cont')

Urine Opiate Quantitation:  (cont')
    CODEINE: _____ 0.74 MICROGRAMS/ML
    MORPHINE: _____ GREATER THAN 4 MICROGRAMS/ML
    6-MONOACETYLMORPHINE: _____ 2.5 MICROGRAMS/ML
    Hydrocodone: _____ Negative
    HYDROMORPHONE: _____ 0.13 MICROGRAMS/ML
    Oxycodone: _____ Negative
    Dihydrocodeine (Hydrocodol): _____ Negative
    Oxymorphone: _____ Negative


Antecubital vein and fat:

  Opiate Quantitation:
    MORPHINE: _____ 0.28 MICROGRAMS/GM
    Codeine: _____ Negative
    6-Monoacetylmorphine: _____ Negative
    Hydrocodone: _____ Negative
    Hydromorphone: _____ Negative
    Oxycodone: _____ Negative
    Oxymorphone: _____ Negative
    Dihydrocodeine: _____ Negative


Right anterior forearm vein and fat:

  Opiate Quantitation:
    MORPHINE: _____ 0.14 MICROGRAMS/GM
    Codeine: _____ Negative
    6-Monoacetylmorphine: _____ Negative
    Hydrocodone: _____ Negative
    Hydromorphone: _____ Negative
    Oxycodone: _____ Negative
    Oxymorphone: _____ Negative
    Dihdyrocodeine: _____ Negative


Right ventral forearm vein and fat:

  Opiate Quantitation:
    MORPHINE : _____ 0.16 MICROGRAMS/GM
    Codeine: _____ Negative
    6-Monoacetylmorphine: _____ Negative

=================================================================

W.S.

29

St. Louis University Toxicology Laboratory Report
6059 N. Hanley Road, Berkeley, Missouri 63134

Name: ▇▇REDACTED▇▇                                      Tox # 2013-1255
   Age: 27 years               Race: White             Sex: Male

Right ventral forearm vein and fat:  (cont')

Opiate Quantitation:   (cont')
   Hydrocodone: _____Negative
   Hydromorphone: _____Negative
   Oxycodone: _____Negative
   Oxymorphone: _____Negative
   Dihydrocodeine: _____Negative


Right anterior forearm vein and fat :

   Opiate Quantitation:
   MORPHINE : _____0.11 MICROGRAMS/GM
   Codeine: _____Negative
   6-Monoacetylmorphine: _____Negative
   Hydrocodone: _____Negative
   Hydromorphone: _____Negative
   Oxycodone: _____Negative
   Oxymorphone: _____Negative
   Dihydrocodeine: _____Negative


Left antecubital vein and fat:

   Opiate Quantitation:
   MORPHINE : _____0.14 MICROGRAMS/GM
   Codeine: _____Negative
   6-Monoacetylmorphine: _____Negative
   Hydrocodone: _____Negative
   Hydromorphone: _____Negative
   Oxycodone: _____Negative
   Oxymorphone: _____Negative
   Dihydyrocodeine: _____Negative


===============================================================================

Requested by: DR. BIEDRZYCKI          Date: 02/15/13

Received in Lab:                      Date/Time: 02/19/13//09:20 AM

Report by: DR. CHRISTOPHER LONG       Date/Time: 03/13/2013//06:10 AM

6.

30

¶43 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Circuit courts across the state frequently address the question presented in the instant case: "How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians?"[1]

¶44 This question lies at the intersection of the Confrontation Clause and the rules of evidence. Answering the question requires the application of the Confrontation Clause to numerous types of laboratory reports and witnesses testifying about or relying on reports they did not produce.[2]

¶45 "Testimonial statements of witnesses absent from trial" violate a defendant's confrontation right unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59 (2004). Crawford substantially changed confrontation law.

¶46 Since Crawford, the United State Supreme Court has progressively defined whether out-of-court statements of different types and in different contexts are testimonial. Some might say that the United States Supreme Court cases defining testimonial are in disarray, and this disarray is reflected in opinions being rendered across the country.

---

[1] State v. Deadwiller, 2013 WI 75, ¶47, 350 Wis. 2d 138, 834 N.W.2d 362 (Abrahamson, C.J., concurring).

[2] Deadwiller, 350 Wis. 2d 138, ¶51 (Abrahamson, C.J., concurring).

¶47 The instant case involves an autopsy report and a toxicology report. The autopsy report was admitted in evidence. The medical examiner who produced the report testified and was subject to examination and cross-examination about the autopsy report. The admission of the autopsy report in evidence does not present a confrontation issue.

¶48 By contrast, the toxicology report was admitted into evidence by the circuit court, which stated that the toxicology report was not being "offered to prove any element that is at issue in this particular case in terms of what substance was delivered." The toxicology report was prepared at the request of the medical examiner by an independent, out-of-state laboratory. No witness testified about the preparation of the toxicology report. The medical examiner referred to the toxicology report in her testimony about the autopsy and her opinion about the cause of death.[3]

¶49 On appeal, however, the parties, the certification by the court of appeals, and the majority opinion apparently are inconsistent in how they characterize the admission of the toxicology report in evidence. Although the majority opinion mentions that the circuit court did not admit the toxicology report for its truth, majority op., ¶15, the majority opinion is

---

[3] See Williams v. Illinois, 132 S. Ct. 2221 (2012) (plurality opinion) (No Sixth Amendment violation exists when "[a]n expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood.").

not clear in how it treats the admission of the toxicology report. Compare majority op., ¶15 ("[T]he toxicology report "was admissible under Wis. Stat. § 907.03 (2011-12) as a basis for expert opinion testimony . . . ."), ¶19 ("Whether the admission of the toxicology report and the medical examiner's testimony based upon it violates Mattox's Sixth Amendment right to confrontation . . . .); ¶41 ("[W]e conclude the toxicology report here is not 'testimonial' and its use at trial therefore did not infringe upon Mattox's confrontation right.").

¶50 What is clear in the majority opinion is that it adopts a primary purpose test for determining whether the toxicology report, a forensic report, is testimonial under the confrontation clause.

¶51 The majority opinion at ¶32 (emphasis added and internal citations omitted) asserts that it takes its formulation of the primary purpose test from Ohio v. Clark, 135 S. Ct. 2173 (2015), and states the test as follows:

> [T]he dispositive "question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony." . . . The primary purpose test decides whether the declarant is acting as a witness against the defendant . . . by considering whether the primary purpose of the out-of-court statement "was to gather evidence for [the defendant's] prosecution."[4]

---

[4] Ohio v. Clark, 135 S. Ct. 2173 (2015), involves a traditional out-of-court declarant's statement. It does not address forensic reports.

(continued)

3

¶52 The majority opinion's approach presents two difficulties, however——difficulties the majority opinion masks.

- Although the majority opinion states that Clark "pronounces the controlling principles in determining whether an out-of-court statement is 'testimonial,'" majority op., ¶32, the majority opinion's statement of Clark's primary purpose test is not fully faithful to Clark. The majority opinion, without explanation, cherry-picks what might be characterized as the narrowest formulation of Clark's primary purpose test and severely limits the definition of "testimonial" for purposes of the confrontation clause.

---

In Clark, the United States Supreme Court held that a child's statement to her teacher, which asserted that her mother's boyfriend was abusing her, was nontestimonial. The statement was nontestimonial because the child was too young to have the primary purpose to accuse the defendant and made the statements in the context of an ongoing emergency (his mother's boyfriend's abuse). Clark, 135 S. Ct. at 2184 (Scalia, J., concurring).

Justice Scalia, who wrote Crawford v. Washington, 541 U.S. 36 (2004), beginning a new era in confrontation law, concurred in Clark, declaring that the majority in the United States Supreme Court is "shoveling fresh dirt upon the Sixth Amendment right of confrontation so recently rescued from the grave in Crawford v. Washington . . . ." Clark, 135 S. Ct. at 2184 (2015) (Scalia, J., concurring).

The majority opinion also gleans from the Clark opinion the following factors relevant in the primary purpose analysis: "(1) The formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant and (4) the context in which the statement was given." Majority op., ¶32 (footnote omitted).

4

- Although all nine justices of the United States Supreme Court (as of the Court's last forays into defining "testimonial") agree that whether an out of court statement is testimonial depends (at least to an extent) on the primary purpose of the out-of-court statement, the United States Supreme Court justices have not uniformly or consistently formulated the primary purpose test. Different primary purpose tests are set forth by different justices in different contexts. Slight differences in the formulation of the primary purpose test can lead a court to a different conclusion regarding the testimonial nature of out-of-court statements.

¶53 The majority opinion is not fully faithful to Clark because it does not reveal or apply a primary purpose test that Clark derives from confrontation cases. Clark declares that "[statements] are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2180 (quoting Davis v. Washington, 547 U.S. 813 (2006)). I refer to this formulation of the primary purpose test as the "potentially relevant" test.

¶54 The United States Supreme Court cases demonstrate that the justices are not necessarily in agreement about the formulation of the primary purpose test. I therefore examine the Court's confrontation cases to set forth the various

5

formulations of the primary purpose test, including the "potentially relevant" test.

¶55 I begin with the Crawford case, the seminal confrontation clause case.[5]

¶56 Although Crawford did not conclusively define "testimonial," the Court did set forth three "formulations of [the] core class of testimonial' statements," which appear to have influenced later formulations of the primary purpose test:

> [E]x parte in-court testimony or its functional equivalent——that is, . . . pretrial statements that declarants would reasonably expect to be used prosecutorially.

Crawford, 541 U.S. at 51 (quoting Brief for Petitioner Michael Crawford).

> [E]xtrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.

Crawford, 541 U.S. at 51 (quoting White v. Illinois, 502 U.S. 346, 365 (Thomas, J., concurring in part & concurring in judgment).

> [S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

---

[5] Crawford v. Washington, 541 U.S. 36 (2004), involved an assault and attempted murder case. At trial, the State introduced an incriminating recorded statement made by the defendant's wife (she did not testify because of marital privilege). The Court held that the State's use of the recorded statement violated the Confrontation Clause.

Crawford, 541 U.S. at 52 (quoting Brief for Amicus Curiae National Association of Criminal Defense Lawyers).[6]

¶57 Then, in Davis v. Washington, 547 U.S. 813, 822 (2006),[7] Justice Scalia stated the primary purpose test as follows:

> [Statements] are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822.

¶58 In Michigan v. Bryant, 562 U.S. 344 (2011),[8] the primary purpose inquiry was described using Justice Scalia's "potentially relevant" formulation of the primary purpose test as follows:

> [Statements] are testimonial when the circumstances objectively indicate that . . . the primary

---

[6] See State v. Manuel, 2005 WI 75, ¶37, 281 Wis. 2d 554, 697 N.W.2d 811 (stating these three formulations).

[7] Davis v. Washington, 547 U.S. 813, 822 (2006), involved two cases consolidated on appeal. Each involved out-of-court statements made by domestic abuse victims and then used at trial. One case (Davis v. Washington) held nontestimonial a domestic abuse victim's statements made to a 911 operator during an altercation with her boyfriend. The second case (Hammon v. Indiana) held testimonial an affidavit written by a domestic abuse victim with the assistance of law enforcement.

[8] Michigan v. Bryant, 562 U.S. 344, involved a statement made to law enforcement by a shooting victim lying mortally wounded in a parking lot. The victim died shortly thereafter, but his statement was later used at trial; the petitioner was convicted of second-degree murder at trial. The Court held that the statement identifying, describing, and locating the shooter were not testimonial statements because they had a "primary purpose . . . to enable police assistance to meet an ongoing emergency." Bryant, 562 U.S. at 349.

7

purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.

Bryant, 562 U.S. at 356 (quoting Davis, 547 U.S. at 822). Justice Sotomayor, writing for the majority in Bryant, stated the test as follows:

> When, as in Davis, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.

Bryant, 562 U.S. at 358.

¶59 In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009),[9] the Court considered the testimonial nature of forensic reports for the first time since Crawford. Melendez-Diaz stated the primary purpose test as follows:

> [Statements are testimonial when] "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

Melendez-Diaz, 557 U.S. at 311 (quoting Crawford, 541 U.S. at 52).

---

[9] In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009), the trial court admitted certificates of state crime laboratory analysis that concluded that the drugs seized were cocaine. The Court held that admission of these certificates without in-person testimony by the analyst violated the defendant's confrontation right.

8

¶60 In Bullcoming v. New Mexico, 564 U.S. 647 (2011),[10] another case involving a forensic report, the primary purpose inquiry was described in "potentially relevant" terms as follows:

> To rank as "testimonial," a statement must have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution."

Bullcoming, 564 U.S. at 659 n.6 (quoting Davis, 547 U.S. at 822).[11] Concurring in Bullcoming, Justice Sotomayor stated the primary purpose test as follows:

---

[10] Bullcoming v. New Mexico, 564 U.S. 647 (2011), involved a forensic laboratory report certifying that the defendant had a blood-alcohol concentration that was above the legal limit. The analyst who prepared the report was on unpaid leave, so the State attempted to use the testimony of another analyst to validate the report. Over the petitioner's objection, the trial court admitted the report into evidence. The Court held that admitting this report violated the defendant's confrontation rights because the preparing analyst did not testify.

[11] The Bullcoming court explicitly rejected the argument that the report of the forensic lab analyst is nontestimonial because the analysts are "mere scriveners" who transcribe results from machines but do not interpret or exercise independent judgment. Bullcoming, 564 U.S. at 659. Instead, Justice Ginsburg explained:

> [The analyst] certified [in the report] that he received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number "correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition. . . affect[ed] the integrity of the sample or . . . the validity of the analysis." These representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.

(continued)

> To determine if a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony."

Bullcoming, 564 U.S. at 669 (Sotomayor, J., concurring) (quoting Bryant, 562 U.S. at 357).

¶61 In Williams v. Illinois, 132 S. Ct. 2221 (2012)[12], the Court's third case involving a forensic report, the primary purpose was described as follows:

> In identifying the primary purpose of an out-of-court statement, we apply an objective test. We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances.
>
> . . . .
>
> Here, the primary purpose of the . . . report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial.

Williams, 132 S. Ct. at 2243.

¶62 The dissent in Williams criticized this formulation of the primary purpose test as devoid of support in either the text

---

Bullcoming, 564 U.S. at 660 (internal citations omitted).

The Court also noted that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." Bullcoming, 564 U.S. at 661 (2011).

Finally, the Bullcoming Court reiterated that the Sixth Amendment confrontation right could not be diminished for the sake of administrative or prosecutorial convenience.

[12] Williams v. Illinois, 132 S. Ct. 2221 (2012), involved a bench trial for rape. A forensic specialist testified that a sample of petitioner's blood matched a DNA profile collected through a vaginal swab and analyzed by an independent laboratory.

or the history of the Sixth Amendment's confrontation right. Justice Kagan wrote that no case has ever suggested that the statement must be meant to accuse a previously identified individual. Williams, 132 S. Ct. at 2273 (Kagan, J., dissenting). Justice Kagan reiterated that the primary purpose test using the "potentially relevant" standard is proper as follows:

> We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—— in other words, for the purpose of providing evidence. . . . None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual . . . .

Williams, 132 S. Ct. at 2273-74 (Kagan, J., dissenting) (quoting Davis, 547 U.S. at 822; citing Bullcoming, 131 S. Ct. at 2716-17; Bryant, 131 S. Ct. at 1157, 1165; Melendez-Diaz, 557 U.S. at 310-11; Crawford, 541 U.S. at 51-52)

¶63 These several formulations of the primary purpose test are informative and illustrate that the U.S. Supreme Court has not adopted a single, definitive formulation of the primary purpose test.

¶64 The "potentially relevant" test, however, is the most prevalent in the Court's cases,[13] and is helpful in the instant

---

[13] See People v. Lopez, 286 P.3d 469, 490 (Cal. 2012) (Liu, J., dissenting) (the "potentially relevant" formulation of the primary purpose test is the "most faithful to the high court's authoritative pronouncements in prior cases going back to Crawford.").

For a discussion of hearsay, constitutional confrontation, and due process, see 2 McCormick on Evidence § 252 (Kenneth S. Broun ed., 7th ed. 2013 & Supp. 2016).

case: "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." Bullcoming, 564 U.S. at 659, n.6 (quoting Davis, 547 U.S. at 822.

¶65 In applying the various formulations of the primary purpose test, I would look first and foremost to the three United States Supreme Court cases involving forensic reports: Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 132 S. Ct. 2221 (2012).

¶66 In the first two of these three cases, the United States Supreme Court concluded that the forensic reports were testimonial and did bear a resemblance to the historical practices that the confrontation clause aims to eliminate. The third case did not produce a majority opinion and has been subject to a variety of interpretations, but may hold no precedential value except in cases with identical facts. See majority op., ¶30 (explaining the limited precedential value of Williams v. Illinois).

¶67 Clark involves a traditional out-of-court declarant's statement, not a forensic report. Clark does not address these three prior Supreme Court cases involving the confrontation clause and forensic reports.[14] The majority opinion's

---

[14] The three United States Supreme Court forensic report cases, however, are lost along the way as Clark does not cite Bullcoming, Melendez-Diaz, or Williams and does not address forensic reports.

application of the primary purpose test fails to consider the guidance that these prior three cases dealing with forensic reports offer.

¶68 The "potentially relevant" test was used in Bullcoming, which involves a forensic report, as does the instant case. The forensic report in the instant case is similar to the forensic tests used to determine whether a substance is a controlled substance. See, e.g., Melendez-Diaz, 557 U.S. 305 (holding testimonial an analyst's report that substance was cocaine).

¶69 With little success, the majority opinion attempts to distinguish Melendez-Diaz and Bullcoming because the toxicology report in the instant case "lists the concentrations of the various substances present in S.L.'s biological samples sent for testing," so "the analyst who signed the report was not acting as a witness against Mattox . . . ." Majority op., ¶29.

¶70 This argument appears to be similar to the "mere scrivener" argument already rejected in Bullcoming. The Bullcoming court explicitly rejected the argument that forensic lab analysts' reports are nontestimonial because the analysts are "mere scriveners" who transcribe results from machines but do not interpret or exercise independent judgment. Bullcoming, 564 U.S. at 659.[15]

---

[15] Justice Ginsburg explained:

> [The analyst] certified [in the report] that he received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number
> (continued)

13

¶71 The "potentially relevant" test seems in keeping with the purpose of the confrontation clause: "[T]he Clause's ultimate goal is to ensure reliability of evidence . . . by testing in the crucible of cross-examination." Crawford, 541 U.S. at 61. And the "principal evil at which the Clause was directed . . . [was] use of ex parte examinations as evidence against the accused." Crawford, 541 U.S. at 50. In the instant case, the toxicology report is a form of ex parte examination insofar as the report was prepared outside of the circuit court or the defendant's presence. Because the State used the toxicology report as evidence against the defendant, he had the right to test the reliability of the report through cross-examination.

¶72 Furthermore, the "potentially relevant" formulation of primary purpose seems to fit the circumstances of the instant case. "None of [the Court's] cases has ever suggested that . . . the statement must be meant to accuse a previously

---

"correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition . . . affect[ed] the integrity of the sample or . . . the validity of the analysis." These representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.

Bullcoming, 564 U.S. at 660 (internal citations omitted).

The Court also noted that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." Bullcoming, 564 U.S. at 661.

14

identified individual . . . ." Williams, 132 S. Ct. at 2274 (Kagan, J., dissenting). Even though the toxicology report was not about Mattox, it could be (and was) used against Mattox.

¶73 The majority opinion does not explain why it ignores the "potentially relevant" formulation of the primary purpose test and how the "potentially relevant" formulation would apply in the instant case. Instead, the majority states and applies a primary purpose test that limits "testimonial" to those statements that create "an out-of-court substitute for trial testimony" in which the declarant "act[s] as a witness against the defendant." The majority opinion looks to whether the "primary purpose of the out-of-court statement was to gather evidence for the defendant's prosecution." Majority op., ¶32 (emphasis added).[16]

---

[16] Although the majority says that Clark "pronounces the controlling principles in determining whether an out-of-court statement is 'testimonial,'" majority op., ¶32, the majority's restatement of the primarily purpose test is not fully faithful to Clark. Clark actually uses the language "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2180 (emphasis added).

Because Clark uses "potentially relevant," I do the same. The majority's language, "to create an out-of-court substitute for trial testimony," implies a higher Sixth Amendment bar.

15

¶74 The question is whether this formulation of the primary purpose test comports with the bulk of the Court's confrontation cases. It does not.[17]

¶75 The majority opinion should refocus its inquiry to include as a primary purpose whether the toxicology report had a primary purpose of establishing "past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822.

¶76 Applying the "potentially relevant" formulation in the instant case, as well as the other formulations of the primary purpose test, I conclude that the toxicology report's primary purpose was to establish whether S.L. died of a heroin overdose, a fact that was "potentially relevant to later prosecution."

¶77 When the Waukesha Medical Examiner's Office requested a toxicology report conducted with samples taken from S.L., the report's primary purpose was to aid in determining the cause of S.L.'s death——a fact "potentially relevant" to a later prosecution. While external signs at the scene of the death, as well as those discovered during the autopsy, suggested an overdose, the toxicology report was needed to determine what type of drug caused the overdose. When the circumstances surrounding the report are considered, the "primary purpose" of

---

[17] "None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory 'analysts are not subject to confrontation because they are not "accusatory" witnesses.'" Williams, 132 S. Ct. at 2274 (Kagan, J., dissenting) (quoting Melendez-Diaz, 557 U.S. at 313.

16

the toxicology report was arguably to "establish or prove past events <u>potentially relevant</u> to later criminal prosecution." <u>Clark</u>, 135 S. Ct. at 2179-80 (emphasis added).

¶78 The report was "made for the purpose of establishing or proving some fact," <u>Melendez-Diaz</u>, 557 U.S. at 310-11, and that fact was "potentially relevant to later criminal prosecution." <u>Clark</u>, 135 S. Ct at 2180. That fact being, of course, that S.L.'s death was caused by an overdose of heroin——a fact that, at that time, Dr. Okia surely considered to be relevant to a later criminal prosecution.

¶79 Remember, S.L.'s death was the subject of a law enforcement investigation from the outset. When Dr. Okia's colleague, Deputy Medical Examiner Nichol Wayd,[18] arrived at the scene of S.L.'s death in the predawn hours of February 2, 2013, after being called to the scene by law enforcement, she was briefed by law enforcement before investigating the death. Wayd also had to wait for a detective to arrive before touching anything at the scene of the death. At trial, the prosecutor asked about what Wayd does with death-related evidence when she investigates a death. Wayd responded:

---

[18] Nichol Wayd was a "deputy medical examiner/investigator for the Waukesha County Medical Examiner's Office." She testified at Mattox's trial. Part of her testimony involved her qualifications and her qualification as an expert "in the field of <u>crime scene investigations</u>" (emphasis added). Significantly, she has special training "in the area of crime scene investigations involving drug overdoses" and is a "diplomate" of and member of "the American Board of Medicolegal Death Investigators." In addition to testifying at trial, Wayd prepared an "Investigative Report" that was admitted at trial.

17

> It depends on the circumstances. In this circumstance, I was asked to wait for the detectives to arrive before I touched anything that could potentially need to be preserved, so in this situation, I did not touch any evidence in the room or even in the residence for that matter, so I stood by, waited for the detectives to arrive . . . .

Once the detective arrived, the detective and the deputy medical examiner investigated S.L.'s room and the deputy medical examiner did a preliminary examination of the body before transporting it to the morgue. Even at this early stage, the detective's presence indicates that law enforcement were conducting a law enforcement investigation of S.L.'s death.

¶80 Dr. Okia performed an autopsy the next morning. Before conducting the autopsy of S.L.'s body, Dr. Okia would presumably have reviewed the deputy medical examiner's "Investigative Report" or another document to apprise herself of the situation surrounding S.L.'s death. She must have noted that S.L.'s death occurred under suspicious circumstances (he was, after all, an apparently healthy 27-year-old found dead), suggesting that the death may have been the result of a crime.

¶81 By her examination of the body (and review of the report's discussion of the evidence obtained in S.L.'s room, such as syringes), Dr. Okia must have suspected that S.L. died because of a drug overdose and that there might be a homicide charge against the deliverer of a controlled substance. Wis. Stat. § 940.02(2)(a). Therefore, when she ordered the toxicology report, her primary purpose was to determine whether an illegal drug caused an overdose.

18

¶82 Ultimately, Dr. Okia would use the toxicology report as a basis for her conclusion that S.L. died of a heroin overdose. Establishing that S.L. died from heroin was essential to the prosecution's charge against Mattox: homicide by distribution of a controlled substance. Dr. Okia testified that the signs of overdose discovered through her examination were consistent with the signs of an over-the-counter opiate overdose.

¶83 Surely, under these facts, the toxicology report was "prepared in connection with a criminal investigation or prosecution . . . [and] therefore within the compass of the Confrontation Clause." Bullcoming, 564 U.S. at 658-59.

¶84 It bears repeating that law enforcement and the Waukesha Medical Examiner's Office worked together from the beginning.

¶85 The close legal relationship between medical examiners, law enforcement, and district attorneys in Wisconsin also evidences a testimonial purpose.

¶86 In Wisconsin, medical examiners work in close conjunction with law enforcement pursuant to Wis. Stat. ch. 979 when investigating deaths and their duties overlap with those of law enforcement. By statute, police must immediately notify the medical examiner when a death occurs under a variety of

circumstances, including suspected homicides or other suspicious circumstances. Wis. Stat. § 979.01(1g).[19]

¶87 Furthermore, the resulting toxicology report helped to prove a fact (cause of death) that was "potentially relevant" to a future prosecution, even if not yet commenced. Clark, 135 S. Ct. at 2179.

---

[19] Medical examiners (or district attorneys) may order autopsies "in cases where an inquest might be had as provided in s. 979.04 . . . ." Wis. Stat. § 979.02. Inquests may be ordered if

> there is reason to believe from the circumstances surrounding the death that felony murder, first-degree or 2nd-degree intentional homicide, first-degree or 2nd-degree reckless homicide, homicide by negligent handling of dangerous weapon, explosives or fire, homicide by negligent operation of vehicle, homicide resulting from negligent control of a vicious animal or homicide by intoxicated user of a vehicle or firearm may have been committed, or that death may have been due to suicide or unexplained or suspicious circumstances . . . .

Wis. Stat. § 979.04(2) (emphasis added).

See Olejnik v. England, 147 F. Supp. 3d 763 (W.D. Wis. 2015):

> [A] medical examiner acts outside his jurisdiction when he orders or conducts an autopsy either without having made a subjective determination that there is any reason to believe that any of the statutory circumstances justifying an autopsy exists or having made a subjective determination that there is no reason to believe that any of the statutory circumstances justifying an autopsy exists.

Olejnik, 147 F. Supp. 3d at 775 (quoting Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 292 N.W.2d 816 (1980)).

¶88 I turn from the majority opinion's analysis of primary purpose to additional factors set forth in Clark that demonstrate that the toxicology report is nontestimonial. See majority op., ¶¶32, 35-37.

¶89 In the instant case, the pertinent factors are the statement's context and formality, including whether the statement was given to law enforcement. Because I have already discussed context as part of my application of the primary purpose test——which the majority seems to do, as well, majority op., ¶¶33, 35, 36——I consider the formality of the toxicology report.

¶90 Although the majority tries to downplay the formality of the toxicology report, see majority op., ¶34, the toxicology report's formality is functionally equivalent to that of the forensic report in Bullcoming.

¶91 The toxicology "report" is a "signed document[s] providing the results of forensic testing designed to "'prove[e] some fact' in a criminal proceeding." Williams, 132 S. Ct. at 2266 (Kagan, J., dissenting) (discussing Bullcoming). And like the report in Bullcoming, the toxicology report's formal certification is limited to a signature by the analyst on a formal document entitled "St. Louis University Toxicology Laboratory Report." Although Waukesha County did not have to produce at trial "everyone who laid hands on the evidence," Melendez-Diaz, 129 S. Ct. at 2532, n.1, the defendant Mattox had a right to confront someone who helped produce the toxicology report or could give an independent opinion of the report.

21

¶92 The analyst's signature on this sort of document is an important indicium of formality because it certifies a constant chain of custody, integrity of the processes used by the St. Louis University Laboratory, and, overall, the accuracy of the report's contents——that is, the signature certifies the assertions contained in the report regarding levels of toxicity contained in S.L.'s blood and tissue samples. See Bullcoming, 564 U.S. at 661-62.

¶93 I conclude that the majority opinion erroneously classifies the report as non-testimonial. Dr. Okia ordered the toxicology report in circumstances indicating that the autopsy she was conducting might be potentially relevant to a later criminal prosecution. Indeed, she ordered the toxicology report pursuant to the quasi-law enforcement role set forth for medical examiners in Wis. Stat. § 979.04(2).

¶94 Finally, like in Bullcoming and Melendez-Diaz, the problem with the toxicology report's admission was that it was used to prove a fact at trial, but no one was able to testify about the processes used at the testing facility.

¶95 The majority opinion's flawed application of the primary purpose test has not provided a "Crawford boundary," where courts may find a "logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so." Williams, 132 S. Ct. at 2246, 2248 (Breyer, J., concurring).

22

¶96 Moreover, the majority opinion goes further than applying the primary purpose test and other factors to the facts of the instant case. It sets forth a general rule: Toxicology reports ordered in circumstances similar to those presented in the instant case are non-testimonial. Majority op., ¶¶40, 42.

¶97 The majority opinion's general rule is unwarranted. The primary purpose test is necessarily fact-specific. The majority opinion should not attempt to issue a bright-line rule covering all cases under the auspices of a fact-driven test. Future cases will differ from the instant case in one aspect or another, but the majority opinion's bright-line rule may not respect these differences.

¶98 Finally, although this court has declared that "we believe a broad definition of testimonial is required to guarantee that the right to confrontation is preserved," State v. Jensen, 2007 WI 26, ¶24, 299 Wis. 2d 267, 284, 727 N.W.2d 518, 527, the majority opinion provides, instead, a broad definition of "nontestimonial."

¶99 The demands of the Confrontation Clause were not satisfied in the instant case. No witness was available for cross-examination who could testify to the means by which the toxicology report was produced or could give his or her independent opinion of the data. See State v. Griep, 2015 WI 40, 361 Wis. 2d 657, 863 N.W.2d 567; State v. VanDyke, 2015 WI App 30, 361 Wis. 2d 738, 863 N.W.2d 919.

¶100 For these reasons, I respectfully dissent.

23

¶101 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissenting opinion.